TM:RJN/RP
F.#2011R00633

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

                             Cr. No. <u>11-345 (S-2)(SLT)</u>

AFRIM KUPA,
LULZIM KUPA,
    also known as "Luzi,"
KEITH LEVINE,
    also known as "Tutti,"
NEIL LOMBARDO,
NEZER PAPRANIKU,
    also known as "Ziti," and
JOSEPH SCLAFANI,
    also known as "Joe Boy,"

            Defendants.

- - - - - - - - - - - - - - - -X

THE GOVERNMENT'S OPPOSITION TO THE
DEFENDANTS AFRIM KUPA, NEIL LOMBARDO AND
<u>JOSEPH SCLAFANI'S PRE-TRIAL MOTIONS</u>

                                      LORETTA E. LYNCH
                                      United States Attorney
                                      Eastern District of New York
                                      271 Cadman Plaza East
                                      Brooklyn, New York 11201

RACHEL NASH
ROBERT POLEMENI
Assistant United States Attorneys
    (Of Counsel)

PRELIMINARY STATEMENT

The defendants Afrim Kupa ("A. Kupa"), Neil Lombardo and Joseph Sclafani are charged in Counts One and Two of the superseding indictment ("S-2") with conspiracy to distribute and distribution of cocaine, in violation of U.S.C. 21 §§ 841(a), 841(b)(1)(A)(II)(ii) and 846.  These charges are based on a large-scale cocaine distribution operation led by Lombardo and Sclafani and involving co-defendants A. Kupa, Lulzim Kupa ("L. Kupa"), Nezer Papraniku and others.  In addition, Sclafani is charged in Counts Three and Four of S-2 with conspiracy to distribute and distribution of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vii) and 846, for his involvement in the distribution of over 1,000 marijuana plants produced in marijuana growing operations in Staten Island, New York.

In their pretrial motions, A. Kupa and Sclafani move to suppress evidence seized pursuant to search warrants issued by the United States District Court, Eastern District of New York. In addition, Sclafani moves to suppress: (1) the contents of cellular phones seized at the time of his arrest in 2011 and a prior arrest in 2009 and (2) consensual recordings made by a cooperating witness.  Sclafani further makes several demands for discovery and information regarding a cooperating witness pursuant to Giglio v. United States, 405 U.S. 150, 154 (1972).

1

Lombardo and A. Kupa also move to sever the first two counts of S-2 from the third and fourth counts on the grounds that the charges relating to marijuana distribution are not properly joined with the charges relating to the cocaine distribution. For the reasons set forth below, the government respectfully submits that the defendants' motions should be denied.

I.   Factual Background

        The charges in the superseding indictment stem from a proactive investigation into the defendants' involvement in drug trafficking and other criminal activities.  At the trial, the evidence against the defendants, which will include the testimony of and consensual recordings made by cooperating witnesses ("CW1" and "CW2") as well as physical evidence, will demonstrate that the defendants were involved in a large-scale drug-trafficking organization in Staten Island, New York, and elsewhere.

    A.   Charges

        On April 12, 2011, defendant Keith Levine ("Levine") was arrested by special agents with the Drug Enforcement Administration ("DEA") on a complaint and charged with conspiring to distribute marijuana.  On May 11, 2011, he was indicted by a grand jury in the Eastern District of New York for conspiracy to distribute and distribution of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vii) and 846.

On August 10, 2011, A. Kupa, Lombardo and Sclafani were arrested for their involvement in a cocaine distribution conspiracy.  In addition, Sclafani was charged with his involvement with Keith Levine and others in marijuana distribution.  A grand jury in the United States District Court, Eastern District of New York, returned a superseding indictment adding Sclafani to the marijuana distribution and distribution conspiracy charges already pending against Levine and charging A. Kupa, Lombardo and Sclafani with cocaine distribution and conspiracy to distribute over five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A)(II)(ii) and 846.

Subsequently, on January 16, 2012, L. Kupa and Papraniku were arrested for their involvement in the cocaine distribution conspiracy.  On February 8, 2012, a grand jury in the United States District Court, Eastern District of New York returned a second superseding indictment adding L. Kupa and Papraniku to the cocaine distribution and cocaine distribution conspiracy charges pending against A. Kupa, Lombardo and Sclafani.

B.    <u>Cocaine Distribution</u>

The defendants A. Kupa, L. Kupa, Lombardo, Papraniku and Sclafani are responsible for the distribution of well over five kilograms of cocaine between 2005 and 2012.  Lombardo, who resided in Las Vegas, traveled regularly to New York to supply

Sclafani and CW1 with approximately four to eight kilograms of cocaine per month between 2008 and 2011.  Between June 2011 and August 2011, CW1 consensually recorded several conversations with Lombardo and Sclafani during which they discussed the cocaine distribution operation.  During one of those conversations, Lombardo provided eight kilograms of cocaine to Sclafani and CW1.  Sclafani kept seven kilograms and CW1 kept one.  The package received by CW1 was marked "7,"[1] to indicate that it was the seventh of the eight kilograms.

In addition, L. Kupa and Papraniku supplied cocaine to Sclafani, CW1 and CW2 that they shipped to New York from other states using mail services such as Federal Express.  The cocaine they shipped was delivered to individuals working as doormen in apartment buildings in New York City, who signed for the packages before turning them over to Papraniku or another coconspirator who would, in turn, deliver the cocaine to various other distributors such as CW1 or CW2.

In order to increase their profits, Sclafani and CW1 regularly mixed the cocaine with inert substances to increase its volume through a process known as re-rocking.  During the course of the conspiracy, CW1 also performed that process for cocaine provided by A. Kupa.  However, beginning in approximately April

---

[1]     Laboratory analysis has revealed that the kilogram package contained cocaine that was approximately 67 percent pure.

4

2011, CW1 relied on A. Kupa to re-rock cocaine obtained from Lombardo because CW1, in an effort to avoid detection by law enforcement, had discarded the equipment needed for the re-rocking procedure.

C.    Marijuana Distribution

The investigation also revealed that Levine, Sclafani and others were involved in the large-scale production of marijuana in growing operations located in Staten Island, New York.  For example, Levine, Sclafani, CW1, CW2 and others were involved in cultivating and distributing marijuana produced in a growing operation located at 30-75 Veterans Road West, Staten Island, New York.  In addition, as he discussed during conversations that were consensually recorded by CW1, Sclafani was also responsible for cultivating and distributing marijuana grown in at least two other locations on Staten Island, New York, including one on New Dorp Lane.  On a regular basis, Sclafani and CW1 used proceeds from their marijuana distribution operation to pay for cocaine purchased from Lombardo.

D.    The Search Warrants

During the course of the investigation, DEA agents executed several search warrants authorized by the United States District Court for the Eastern District of New York.  On April 11, 2011, the day of Levine's arrest, DEA agents searched the marijuana growing operation at 30-75 Veterans Road West and

recovered several hundred marijuana plants at different stages of growth, large bags containing dried marijuana leaves, a freezer full of gallon-sized plastic bags containing harvested marijuana packaged for sale, seeds, bags of fertilizer, heat lamps, irrigation tools, and books and records reflecting, among other things, different marijuana plant types and growing cycles.

On August 10, 2011, the day that Sclafani, Lombardo and A. Kupa were arrested, the DEA executed additional search warrants at several locations, including: (1) a marijuana growing operation on New Dorp Lane, Staten Island, New York; (2) Sclafani's residence; (3) A. Kupa's residence; and (4) Lombardo's former residence.  The search warrants for the defendants' residences also included authorization to search any cell phones recovered.

From the marijuana growing operation on New Dorp Lane, agents recovered approximately 150 marijuana plants and observed heat lamps and irrigation equipment.  From Sclafani's residence, agents seized approximately $20,000 and approximately 250 grams of cocaine.  From A. Kupa's residence, agents seized a kilogram of cocaine, two cocaine presses, a 2008 BMW X5, three cellphone jammers, three digital scales, and a cellphone jammer.  Agents did not recover evidence from Lombardo's former residence.

II.  <u>Argument</u>

    A.  <u>Lombardo and A. Kupa Are Properly Joined</u>

        Both Lombardo and A. Kupa argue that they should be severed from the case because Counts One and Two, which charge A. Kupa, Lombardo and Sclafani with conspiracy to distribute and distribution of cocaine, are not properly joined in the same indictment with Counts Three and Four, which charge Sclafani and Levine with conspiracy to distribute marijuana and distribution of marijuana.  Because the defendants are properly joined pursuant to Rule 8 of the Federal Rules of Criminal Procedure, the defendant's motion should be denied.  Under Rule 8(b) of the Federal Rules of Criminal Procedure, the

              indictment . . . may charge 2 or more
              defendants if they are alleged to have
              participated in the same act or transaction,
              or in the same series of acts or
              transactions, constituting an offense or
              offenses.  The defendants may be charged in
              one or more counts together or separately.
              All defendants need not be charged in each
              count.

        In determining the appropriateness of joinder under Rule 8(b), the Second Circuit has held that "multiple defendants may be charged with and tried for multiple offenses only if the offenses are related pursuant to the test set forth in Rule 8(b), that is, only if the charged acts are part of a 'series of acts or transactions constituting . . . offenses.'" <u>United States v. Turoff</u>, 853 F.2d 1037, 1043 (2d Cir. 1988).  If offenses are

7

committed by differing groups of defendants, Rule 8(b) permits joinder as long as there is overlap between the overall schemes that share a common purpose.  See United States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989) (joinder appropriate where there were two groups of defendants charged with separate conspiracies with only one defendant in common to both conspiracies because the transactions alleged in both were part of a series of acts that shared a common purpose of concealing and laundering the income of the common defendant); United States v. Rittweger, 524 F.3d 171, 177-78 (2d Cir. 2008) (holding that defendants were properly joined where the different conspiracies had a common plan or scheme and there was substantial identity of facts or participants).

To determine whether defendants are properly joined, the Second Circuit applies a "'commensense rule' to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper . . . ." Rittweger, 524 F.3d at 177 (citation omitted).  This approach includes consideration of whether severance would result in duplicate trials.  United States v. Stewart, 433 F.3d 273, 314 (2d Cir. 2006).

Here, the two conspiracies, as well as the evidence the government intends to introduce to prove them, including the testimony of and consensual recordings made by cooperating

witnesses, substantially overlap.  For example, CW1 and Sclafani used proceeds generated from their marijuana distribution to cover payments owed to Lombardo for cocaine that he had supplied. Moreover, CW1 and Sclafani stored cocaine purchased from Lombardo and L. Kupa at the marijuana growing operation at 30-75 Veterans Road West and re-rocked cocaine for A. Kupa at that location.  In addition, when Sclafani needed additional quantities of marijuana to supplement the marijuana he produced with CW1 and Levine in the growing operations, he purchased it from individuals including A. Kupa.  Thus, there is sufficient overlap in the conspiracies and the evidence for joinder pursuant to Rule 8. See also United States v. Liveoak, 377 F.3d 859, 865 (8th Cir. 2004) (holding that joinder was proper though not all of the defendants were charged in all counts because the counts were linked by common conspiracy members and a common overall scheme); United States v. Golb, 69 F.3d 1417, 1425-26 (9th Cir. 1995) (holding that joinder was proper where all defendants were charged with money laundering but only some were charged with drug trafficking because the charges were logically related).[2]

---

[2]    Lombardo argues that the face of the superseding indictment is insufficient to permit joinder pursuant to Rule 8. Lombardo Br. at 4.  Several other circuits have held that it is permissible for the district court to rely on evidence proffered by the government that is not set forth on the face of the indictment.  See, e.g., United States v. McGill, 964 F.2d 222, 242 (3d Cir. 1992); United States v. Francis, 367 F.3d 805, 830 (8th Cir. 2004), vacated on other grounds, 543 U.S. 1078, 1108 (2005); United States v. Dominguez, 226 F.3d 1235, 1241 (11th

B.    Evidence Was Properly Seized from the Residences of A.
      Kupa and Sclafani Pursuant to Valid Search Warrants

As set forth above, on August 10, 2011, Sclafani and
A. Kupa were arrested and their residences were searched pursuant
to warrants authorized by the Honorable James Orenstein of the
United States District Court, Eastern District of New York.  The
affidavit in support of the search warrant for Sclafani's
residence ("Sclafani Residence Search Warrant") is attached as
Exhibit 1.  The affidavit in support of the search warrant for A.
Kupa's residence ("A. Kupa Residence Search Warrant") is attached
as Exhibit 2.  During the search of Sclafani's residence, DEA
agents recovered cocaine, jewelry, a drug ledger and a digital
scale.  During the search of A. Kupa's residence, DEA agents
recovered a kilogram of cocaine, a 2008 BMW X5, three cellphone
jammers, three digital scales, two cocaine presses, and a
cellphone jammer.

Both Sclafani and A. Kupa move to suppress the evidence
recovered from their residences arguing that the affidavits
submitted by the DEA Special Agent in support of the search

---

Cir. 2000); United States v. Spriggs, 102 F.3d 1245, 1255 (D.C.
Cir. 1997).  The Second Circuit has not yet ruled on this issue,
though it did suggest in Rittweger, that it might diverge from
this approach.  Rittweger, 524 F.3d at 171, n.3.  Regardless,
here, where Sclafani is charged in each count of the indictment,
the time periods and locations overlap, and the conspiracies
shared a common purpose - namely, the distribution of illegal
narcotics - the face of the indictment is sufficient for joinder
pursuant to Rule 8(b).

warrants do not establish probable cause to search.  For the
reasons set forth below, their motions should be denied.

       1.   The Affidavits Submitted in Support of the Search
            Warrants Establish Probable Cause to Search

      Presented with a warrant application, courts apply a
"totality of the circumstances" test:

> The task of the issuing magistrate is simply
> to make a practical, common-sense decision
> whether, given all the circumstances set
> forth in the affidavit before him, including
> the 'veracity' and 'basis of knowledge' of
> persons supplying hearsay information, there
> is a fair probability that contraband or
> evidence of a crime will be found in a
> particular place.

Illinois v. Gates, 462 U.S. 213, 238 (1983).  It is well
established that "only the probability, and not a prima facie
showing, of criminal activity is the standard of probable cause."
United States v. Martin, 426 F.3d 68, 74 (2d Cir. 2005) (quoting
Gates, 426 U.S. at 235)).  Moreover, "[a] reviewing court must
accord substantial deference to the finding of an issuing
judicial officer that probable cause exists."  United States v.
Wagner, 989 F.2d 69, 72 (2d Cir. 1993).  "In order to encourage
the use of warrants, reviewing courts should read the affidavit
in support of the warrant in a common-sense and realistic
fashion," United States v. Evans, 2008 WL 1858897, at *3 (D. Vt.
Apr. 24, 2008) (citing United States v. Ventresca, 380 U.S. 102,
108 (1965)), and "[c]lose cases should be resolved by upholding

the warrant," id. (citing United States v. Jackstadt, 617 F.2d 12, 14 (1980)).

     a.  Sclafani

       The affidavit submitted in support of the search warrant to search Sclafani's residence provided Judge Orenstein with more than enough information to conclude that there was a "fair probability" that evidence of Sclafani's drug trafficking would be found in his residence.  Among other things, the affidavit informed Judge Orenstein that:

       i.  CS1[3] had been recently arrested by the DEA on marijuana trafficking charges and was cooperating with the government in the hopes of obtaining leniency at sentencing and possible entry into the Witness Security Program.  Sclafani Residence Search Warrant Affidavit ¶ 6, n.2;

       ii.  CS1 informed agents that since approximately 2008, he and Sclafani were involved in a cocaine trafficking operation, that they distributed four to eight kilograms of cocaine per month and that Lombardo was a supplier of the cocaine.  Sclafani Residence Search Warrant Affidavit ¶ 7;

       iii. CS1 informed agents that he had observed Sclafani use multiple cell phones to facilitate his drug trafficking business, had observed cocaine, drug paraphernalia such as a scale, cash and records of narcotics transactions in Sclafani's residence, had frequently made payments to Sclafani for drug transactions at Sclafani's residence; and had observed Sclafani complete cocaine transactions with other customers at Sclafani's residence.  Sclafani Residence Search Warrant Affidavit ¶¶ 8-10;

_____

    [3]    The individual identified as CS1 in the search warrant affidavits is the same individual identified in this submission as CW1.  He was identified as a confidential source in the affidavits because he had not yet pled guilty pursuant to a cooperation agreement.

iv.  CS1 consensually recorded a conversation with Sclafani and Lombardo on June 23, 2011, during which they discussed Lombardo's cocaine shipments, the quantity of cocaine that Sclafani and CS1 could sell, the money that Sclafani and CS1 owed Lombardo for past shipments and the problems that Lombardo faced when Sclafani and CS1 were behind on their payments. During that conversation, Sclafani admitted that he was "trying to move eight a month"[4] and that he had just returned from Boston after driving there himself to collect $10,000 that he was owed by a customer.  Exhibit A to Sclafani Residence Search Warrant Affidavit ¶¶ 19-21[5];

v.  CS1 consensually recorded a conversation with Sclafani at Sclafani's residence on July 6, 2011, during which CS1 paid Sclafani $18,300 in cash as a partial payment for money that CS1 owed to Sclafani in connection with their cocaine distribution operation.  Sclafani Residence Search Warrant Affidavit ¶ 12; and

vi.  CS1 advised that while Sclafani once stored cocaine at 268 New Dorp Lane, Staten Island, New York, where Sclafani operated a marijuana growing operation, Sclafani no longer used that location to store cocaine and that he was not aware of any other stash house used by Sclafani.  Sclafani Residence Search Warrant ¶ 13.

Sclafani concedes that the consensual recordings made by CS1 established probable cause to arrest him on drug trafficking charges.  He argues, however, that suppression of evidence seized from his residence is required because CS1 was the "sole" source of information that provided probable cause to search his residence, and the search warrant affidavit failed to

---

[4]    The Special Agent informed Judge Orenstein that based on his training and experience, he understood Sclafani's statement that he was "trying to move eight a month" to mean that Sclafani was trying to sell eight kilograms of cocaine a month.

[5]    Exhibit A to the Sclafani Residence Search Warrant is the Affidavit in Support of the Arrest Warrant for Sclafani, which was incorporated into the Search Warrant Affidavit by reference.  Sclafani Residence Search Warrant Affidavit ¶ 6.

13

establish CS1's veracity as required by the Supreme Court's
decisions in Aguilar v. Texas, 378 U.S. 108 (1964) and Spinelli
v. United States, 393 U.S. 410 (1969).  Sclafani's argument has
no merit.

As an initial matter, Sclafani's reliance on the
Aguilar-Spinelli test is misplaced.  First, as Sclafani concedes,
the Supreme Court long ago abrogated the Aguilar-Spinelli test in
favor of Gates's "totality of circumstances" test discussed
above.  Second, even when Aguilar-Spinelli was the rule, it was
applied only when law enforcement was relying on information
provided by an undercover informant who was not an actual
participant in the charged crime.  As the Second Circuit
explained in United States v. Rueda, "[Defendant's] argument
ignores, however, those decisions rendered since Spinelli, in
this circuit and others, which recognize that there is no need to
show past reliability where the informant is in fact a
participant in the very crime at issue."  United States v. Rueda,
549 F.2d 865, 869 (2d Cir. 1977); see also United States v.
Burke, 517 F.2d 377, 380-81 (2d Cir. 1975) (noting that the
requirement of establishing prior reliability of corroboration is
addressed to the "particular problem of professional
informants").

The Second Circuit, in United States v. Steppello, 664
F.3d 359 (2d Cir. 2011), recently rejected the very same argument

14

that Sclafani raises.  In that case, the district court

determined that there was no probable cause to arrest because the

police relied upon partially corroborated information provided by

a confidential informant with no history of reliability.  The

Circuit held that the district court erred in discounting

information provided the witness, explaining:

> [the witness] was a participant in the crime
> at issue; he gave the information to officers
> in person after they executed a valid search
> warrant at his residence; and at the time,
> [the witness] was motivated to be truthful to
> receive leniency.  Those circumstances
> suggest reliability.

Id. at 366.  Similarly, in United States v. Reed, 409 Fed. Appx.

471, 473, 2011 WL 454708 (2d Cir. Feb. 10, 2011), the Court

rejected the defendant's contention that an affidavit in support

of a warrant to search his residence should have included

information on the cooperating witness's prior instances of

reliability.  The court observed, "the agent's affidavit

explicitly described the informant as a 'cooperating witness' who

was referred to the agent by an Assistant United States Attorney

and spoke to the government under a 'proffer agreement.'  The

affidavit thus provided the magistrate with all the information

needed to evaluate the informant's credibility."  As in

Steppello, the  affidavit in this case provided information

regarding CS1's arrest and motivation to cooperate.  It also

advised that CS1's information was corroborated by consensual

15

recordings and information provided by other witnesses.  Sclafani
Residence Search Warrant Affidavit ¶ 6, n.2.  Therefore Judge
Orenstein was provided with sufficient information to evaluate
CS1's credibility and reliability.

Moreover, Sclafani's contention that CS1 was the "sole"
source of information to establish probable cause for the search
warrant is simply incorrect.  To be sure, CS1's information
regarding Sclafani's drug trafficking, including his first-hand
knowledge regarding drug activity that took place at Sclafani's
residence, was likely an important factor that Judge Orenstein
considered in issuing the warrant.  But there was more.  Indeed,
Sclafani's own recorded admissions on June 23, 2011, that he was
"trying to move eight a month" and had just returned from Boston
with $10,000, and the Special Agent's experience that drugs,
paraphernalia, money, financial records, address books, and other
items evidencing a defendant's narcotics distribution and its
proceeds were found during a substantial number of residential
searches that he executed in connection with narcotics
trafficking in his 13-year career, provided a substantial basis
for Judge Orenstein to find by a fair probability that evidence
of Sclafani's criminal conduct would be located at his residence.
See United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985); see
also United States v. Donald, 417 Fed. App'x 41, 43, 2011 WL

1110749 (2d Cir. Mar. 28, 2011).  Accordingly, Sclafani's motion should be denied.

> b.   <u>A. Kupa</u>

A. Kupa's motion to suppress the evidence recovered from his residence fares no better than Sclafani's.  A. Kupa argues that the search warrant was not supported by a substantial basis because the affidavit contains deliberate falsehoods or statements made with reckless disregard for their truth.  This allegation is baseless.

A. Kupa objects to the transcript of a consensual recording of a June 28, 2011 conversation between CS1 and A. Kupa at A. Kupa's residence that was included in the affidavit submitted to Judge Orenstein.  A. Kupa submits just two lines from that transcript for the Court's review:

> KUPA:     OH WHAT ARE YOU DOING BUDDY?

> CS1:      U/I COKE

and argues that the affidavit is misleading because the word "coke" cannot be heard on the recording.

Because A. Kupa is challenging the accuracy of representations in the affidavit, he bears the burden of demonstrating by a preponderance of the evidence "(1) that the inaccuracies were the product of a Government agent's 'deliberate falsehood' or 'reckless disregard for the truth' rather than innocent mistake, and (2) that, after setting aside the

17

falsehoods, what remains of the warrant affidavit is insufficient to support a finding of probable cause." United States v. Coreas, 419 F.3d 151, 155 (2d Cir. 2005) (citing Franks v. Delaware, 438 U.S. 154, 171–72 (1978)); "[A]n inaccuracy [in an affidavit] that is the result of negligence or innocent mistake is insufficient to undermine the validity of a search warrant." United States v. Williams, 758 F. Supp. 2d 287, 301 (S.D.N.Y. 2010) (citations omitted).

As an initial matter, A. Kupa omits the vast majority of the transcript of CS1's June 28, 2011 consensual recording that was included in the affidavit.  The entirety of the submitted transcript reads as follows:

> KUPA:    OH WHAT ARE YOU DOING BUDDY?
>
> CS1:     U/I COKE
>
> KUPA:    COME ON I'LL DO IT NOW
>
> CS1:     OH DO IT NOW.  NO I GOT TO GO AND MAKE SURE THE KID GOT IT I DIDN'T BRING IT WITH ME.
>
> KUPA:    ALRIGHT SO JUST GRAB IT AND COME AND DO IT.
>
> CS1:     ALRIGHT.  THE ONLY THING IS IF I CAN'T DO IT TODAY.  CAN WE DO IT TOMORROW SOME TIME.
>
> KUPA:    DO IT WHENEVER YOU WANT.
>
> CS1:     ALRIGHT.

> KUPA:     JUST.  I'D RATHER YOU COME AT NIGHT TIME
>           INSTEAD OF DAY TIME.  YOU KNOW WHAT I'M
>           SAYING.

Exhibit A to A. Kupa Residence Search Warrant ¶ 26.[6]

While A. Kupa argues that the transcript included in the affidavit is misleading because, in his opinion, the word "coke" cannot be heard on the recording, he does not dispute that the transcript otherwise accurately reflects a June 28, 2011 conversation between him and CS1 that took place at his residence at 174 Kensico Street,[7] and that during the conversation he told CS1 to "just grab it and come and do it" and that he preferred that CS1 "come at night instead of day time.  You know what I'm saying."

With respect to whether the word "coke" can be heard on the transcript, the government concedes that the sound on that portion of the audio recording is low.  Nevertheless, the Special Agent believes that he can hear the word "coke" on the recording.

---

[6]     Exhibit A to the A. Kupa Residence Search Warrant is the Affidavit in Support of the Arrest Warrant for A. Kupa, which was incorporated into the Search Warrant by reference.  A. Kupa Residence Search Warrant ¶ 6.

[7]     A. Kupa cannot dispute that the conversation took place at his residence.  On February 22, 2010, A. Kupa was arrested by federal authorities and charged in this Court with stealing jewelry and gold coins from a bank in Brooklyn, New York.  He pled guilty on August 11, 2010, and was sentenced to 46 months' incarceration on July 26, 2011.  On June 28, 2011, A. Kupa was on 24-hour house arrest with electronic monitoring awaiting sentencing, thus confined within the residence at 174 Kensico Street.

In addition, after the recording was made, the Agent debriefed
CS1 about the contents of the conversation that CS1 had with A.
Kupa.  CS1 informed the Special Agent that, during the recorded
conversation, he asked A. Kupa if he could bring cocaine to A.
Kupa's residence for A. Kupa to re-rock.  Accordingly, even if
there is disagreement about what was captured on the recording,
the Special Agent's statements do not include any deliberate
misstatement or reckless disregard for the truth.  Suppression is
thus not warranted.  See United States v. Campino, 890 F.2d 588,
592 (2d Cir. 1989) (holding that not all statements in an
affidavit must be true and that all that is required is that the
statements be "believed or appropriately accepted by the affiant
as true") (quoting Franks, 438 U.S. at 165)).

        Morever, a false statement "is material when the
alleged falsehoods or omissions were necessary to the [issuing]
judge's probable cause finding."  United States v. Awadallah, 349
F.3d 42, 64-65 (2d Cir. 2003) (citation omitted).  "To determine
if the false information was necessary to the issuing judge's
probable cause determination, i.e., material, a court should
disregard the allegedly false statements and determine whether
the remaining portions of the affidavit would support probable
cause to issue the warrant."  Martin, 426 F.3d at 73.

        Here, even if the word "coke" is omitted from the
transcript, A. Kupa clearly instructed CS1 to "just grab it and

20

come and do it" and that he'd "rather [CS1] come at night time instead of day time.  You know what I'm saying."  These statements, in conjunction with the information provided by CS1, provide probable cause to believe that cocaine is the subject of their conversation.

Moreover, the remainder of the affidavit provides more than enough information to conclude that there was a "fair probability" that evidence of A. Kupa's drug trafficking would be found in his residence.  The affidavit states that: (1) A. Kupa had several felony convictions, including a conviction for conspiracy to distribute marijuana for which he was sentenced to 84 months' imprisonment in December 2000; (2) CS1 informed agents that he met with A. Kupa at least twice between April 2011 and June 2011 at A. Kupa's residence and provided A. Kupa with approximately two kilograms of cocaine for A. Kupa to mix with a non-narcotic substance, known as the "cut"; (3) CS1 informed agents that on these occasions, A. Kupa used a press to "re-rock" cocaine; and (4) CS1 advised agents that between April 2011 and June 2011, Sclafani informed CS1 of other occasions when he planned to deliver cocaine to A. Kupa to re-rock.  Exhibit A to A. Kupa Residence Search Warrant ¶¶ 4, 23-25; A. Kupa Residence Search Warrant Affidavit ¶¶ 9-10.  This information, coupled with the Special Agent's experience that drug traffickers routinely keep evidence of their criminal activities in their residences,

is more than enough to conclude that there was a "fair probability" that evidence of drug trafficking would be found in A. Kupa's residence.[8]

C.   The Evidence Recovered from the Cell Phones that Sclafani Possessed on the Day of His Arrest Should Not be Suppressed

Sclafani concedes that agents lawfully seized his cell phones on the day of his arrest on August 10, 2011. He argues, however, that the agents needed a warrant to search the phones because "the information contained on [them], including contact names and phone numbers, is the sort of uniquely personal information often kept private by the person owning the device in which the information is maintained." Because the phones were legally searched, or alternatively, because the contents of the phones would have been inevitably discovered, Sclafani's motion should be denied.

---

[8]    With respect to A. Kupa's claim that there is no recorded conversation between Sclafani and CS1 on August 4, 2011, he is correct, but the conversation referenced in the affidavit occurred on August 3, 2011. Pursuant to the Government's application, the Court permitted delayed disclosure of that recording. It has since been provided. During that conversation, Sclafani, CW1 and a coconspirator discussed, among other topics, the distribution of marijuana, and CW1 advised the Special Agent that Sclafani indicated to him during this conversation that he had purchased marijuana from A. Kupa at his residence. The typographical error with respect to the date of the conversation is not material, and there was nothing improper about the affiant's description of the information CS1 provided about this conversation.

1.   The Cell Phones Were Properly Searched

Sclafani was arrested while driving after having picked up co-defendant Lombardo from the airport.  In a search of his car incident to his arrest, based on probable cause to believe that the car contained evidence of Sclafani's involvement in drug trafficking, and also pursuant to the DEA's regular inventory policy, agents recovered three cell phones from Sclafani's vehicle and recorded the names and phone numbers that were stored in the phones' "contact" list.

It is well established that when law enforcement has "probable cause to believe that a vehicle contains contraband, the officers can conduct a warrantless search of the vehicle without violating the Fourth Amendment."  United States v. Cruz, 834 F.2d 47, 51 (2d. Cir 1987) (citing Carroll v. United States, 267 U.S. 132 (1925)).  When law enforcement agents "have probable cause to search an entire vehicle, they may conduct a warrantless search of every part of the vehicle and its contents, including all containers and packages in the vehicle."  Id. (citing United States v. Ross, 456 U.S. 798, 821 n.28 (1982).

The Second Circuit in United States v. Henderson, 439 Fed. Appx. 56, 2011 WL 4494246 (2d Cir. Sept. 29, 2011), recently upheld the warrantless search of a wallet that the police found in an arrestee's car.  There, the defendant was arrested on identity theft charges; the Circuit held that the district court

23

correctly concluded that the police had a reasonable basis to believe that the defendant's wallet found in his vehicle would yield evidence of his identity theft offense. In so holding, the Circuit relied on the automobile exception to the warrant requirement: "the Supreme Court has held that '[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search *or* if it is reasonable to believe the vehicle contains evidence of the offense of the arrest." Id. at *1 (quoting Arizona v. Gant, 556 U.S. 332 (2009)) (emphasis in Henderson). Here, it was reasonable for agents, in possession of an arrest warrant for Sclafani on drug trafficking charges, a search warrant to search his residence for evidence of drug trafficking, which included authorization to seize any phones and search their contents, and information provided by CS1 that Sclafani often possessed multiple cell phones, to believe that evidence of Sclafani's drug trafficking would be found in his vehicle.

Sclafani, relying on an unpublished opinion from the Northern District of California, United States v. Park, 2007 WL 1521573 (N.D. Cal. May 23, 2007), argues that because a cell phone is "capable of storing immense amounts of highly personal information," the agents were required to obtain a search warrant. As an initial matter, the majority of courts to address

24

the issue, including several circuit courts, have ruled that the search of a cell phone found on a defendant's person is a permissible search incident to arrest in order for law enforcement to look for evidence of the defendant's crimes and preserve it for trial.  See, e.g., United States v. Finley, 477 F.3d 250, 259-260 (5th Cir. 2007) (citing United States v. Robinson, 414 U.S. 218, 235 (1973) and holding that police officer who had effected a lawful arrest did not need a search warrant to search content of cell phone found on defendant's person at time of arrest because police officers effecting a valid arrest may "without any additional justification, look for evidence of the arrestee's crime on his person in order to preserve it for use at trial"); United States v. Murphy, 552 F.3d 405, 411-12 (4th Cir. 2009) (holding that "manifest need to preserve evidence" permits officers to search contents of cell phones with or without a warrant during a search incident to arrest); United States v. Pineda-Areola, 372 Fed. Appx. 661, 663 (7th Cir. 2010) (unpublished) (citing Robinson and Finley and rejecting defendant's argument that officers were not permitted to search his phone and make a phone call: "[e]ven if dialing a phone were considered a search, the officers were entitled to search [defendant] and the phone incident to his lawful arrest"; Silvan W. v. Briggs, 309 Fed. Appx. 216, 225 (10th Cir. 2009) (unpublished) ("[T]he permissible scope of a search incident to

25

arrest includes the content of a cell phone found on the arrestee's person.") (citing Finley).

Moreover, the privacy concern raised by Sclafani and discussed in Park, namely the threat that the search of an arrestee's cell phones will uncover "highly personal information," was not implicated by the agents' search of the contact lists in Sclafani's cell phones.  Indeed, the search of the phones' contact lists is no different, and arguably less intrusive, than the search of a diary or a wallet, which often contain much more personal information, and courts routinely uphold the latter searches as permissible searches incident to arrest.  See, e.g., United States v. Frankenberry, 387 F.2d 337 (2d Cir. 1967) (permissible for police to seize and search diary incident to arrest); United States v. Molinaro, 877 F.2d 1341, 1346 (7th Cir. 1989) (holding that DEA agent's search of defendant's wallet that contained slips of paper containing name and phone numbers of defendant's drug source was permissible search incident to arrest); United States v. McEachern, 675 F.2d 618, 622 (4th Cir. 1982) (search of wallet permissible as search incident to arrest); United States v. Castro, 596 F.2d 674, 677 (5th Cir. 1979) (same); Evans v. Solomon, 681 F. Supp. 2d 233,

248 (E.D.N.Y. 2010) (same).[9]  Accordingly, Sclafani's motion to suppress should be denied.

       2.    The Evidence Recovered From Sclafani's Cell
             Phones Would Have Been Inevitably Discovered

Even if the Court concludes that the search of Sclafani's cell phones was not a permissible search incident to arrest, suppression is still not warranted as the contents of the cell phones would have been inevitably discovered by lawful means.[10]  As noted above, a search warrant for Sclafani's residence already permitted the agents to search the contents of any cell phones seized.  Had agents thought they needed a warrant for the phones seized incident to Sclafani's arrest, their application surely would have been granted.

---

[9]    Sclafani, citing to United States v. Chadwick, 433 U.S. 1 (1977), argues that the search of his phones was also impermissible because it was conducted "at some time later" after his arrest.  Sclafani is wrong.  It is well established that law enforcement may, as agents did here, wait to return to their offices after an arrest to conduct a search of a vehicle.  See United States v. Johns, 469 U.S. 478 (1985) (noting that "officers acted permissibly by waiting until they returned to DEA headquarters before they searched the vehicles and removed their contents").

[10]    To the extent that the Court suppresses the evidence recovered from Sclafani's cell phones, the government maintains that it should be permitted to introduce such evidence on cross-examination to rebut any assertions directly or indirectly made by the defendant or his counsel.  See United States v. Simels, 2009 WL 4730232, at *7 (E.D.N.Y. Dec. 4, 2009) ("[E]vidence obtained in violation of the Fourth Amendment, even though not admissible in the government's case-in-chief, may be used for impeachment of the defendant's own testimony.") (citing Walder v. United States, 347 U.S. 62 (1954)).

The doctrine of inevitable discovery "allows unlawfully obtained evidence to be admitted at trial if the government can 'establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" United States v. Eng, 971 F.2d 854, 859 (2d Cir. 1992) (quoting Nix v. Williams, 467 U.S. 431, 444 (1984)). Under this doctrine, "[i]llegally-obtained evidence will be admissible . . . only where a court can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." United States v. Heath, 455 F.3d 52, 60 (2d Cir. 2006). The contingencies include, among other things, whether "a warrant would have been sought, whether a warrant would have issued, whether the warrant would have specified the articles seized, whether the articles would have remained in place by the time the warrant would have been executed, and whether the articles would have been found in the hypothetical warranted search." United States v. Lavan, 10 F. Supp. 2d 377, 389 (S.D.N.Y. 1998). All of these contingencies are satisfied here.

Had DEA agents believed that they needed to obtain a search warrant to search Sclafani's cell phones for contact information, they would have applied for one. Agents had applied for and obtained arrest warrants for CS1, Sclafani, Lombardo, A.

28

Kupa, L. Kupa, Nezer Papraniku and others after a months-long investigation into their criminal activities.  They applied for and obtained search warrants for residences and other locations. Given the possibility of finding incriminating evidence on the phones, agents would have certainly applied for a warrant had they believed they were required to do so.[11]

The government respectfully submits that had DEA agents sought a warrant to search the phones, it would have been issued. Judge Orenstein had already issued a search warrant for Sclafani's residence authorizing the seizure of, among other things, cell phones and the search of the contents of those cell phones, based, in part, on CS1's information indicating that CS1 had seen Sclafani in possession of multiple cell phones to conduct his narcotics business and based on the affiant's experience that drug traffickers often communicate by telephone, including by text messaging, to facilitate their business.[12] Accordingly, Sclafani's motion to suppress should be denied.

---

[11]    The cell phones, which were, as Sclafani concedes, lawfully seized by agents, remained in the possession of the DEA and any warrant application would have specified them.

[12]    An agent's opinion that drug traffickers use multiple cell phones to facilitate their business is a relevant factor for a judge to consider in determining whether to issue a warrant permitting the search of a cell phone's contents.  See United States v. Lam, 2006 WL 2864019, at *5 (W.D.N.Y. May 23, 2006) (citing cases).

3.    The Evidence Recovered From the 15 Cell Phones
      Recovered by Kansas State Troopers on May 2, 2009
      Arrest Should Not Be Suppressed

On May 2, 2009, Sclafani and another individual, Carmen
Martucci, were stopped by a Kansas state trooper for speeding.
Martucci was driving the 2008 Cadillac that Sclafani owned.
Sclafani was in the passenger seat.  The trooper requested
permission to search the vehicle, and Sclafani consented.
Sclafani told the trooper that he was in possession of $5,000
inside a bag located on the backseat.  The trooper located the bag
which contained $12,390, not $5,000.  Upon further search of the
vehicle, the trooper found $89,880 in cash in three plastic-
wrapped, rubber-banded bundles concealed in a false compartment
found in the rear of the trunk.  A total of $102,270 was recovered
from the vehicle.  Sclafani claimed ownership of all of the money
but declined to answer any more questions about the money without
speaking to an attorney.  Fifteen cell phones and numerous
documents were also found in the vehicle.  Troopers seized the
money, phones and documents.

Sclafani does not seek to suppress the seizure of the
money, documents or the 15 cell phones, but seeks to suppress the
contents of the phone.  He also requests a hearing pursuant to
Kastigar v. United States, 406 U.S. 441 (1972).  As an initial
matter, the defendant's request for a Kastigar hearing is
misplaced.  A Kastigar hearing is held to determine whether the

30

government has improperly used evidence at trial that was
compelled under a grant of federal immunity.  United States v.
Blau, 159 F.3d 68, 72 (2d Cir. 1998).  That is not Sclafani's
claim here.  Moreover, Kastigar hearings are typically held after
a trial.  See United States v. Fernandez, 2000 WL 1409738, at *3
(S.D.N.Y. Sept. 22, 2000)  ("[E]ven if Fernandez had established
the need for a Kastigar hearing, it is general practice in this
circuit to defer such a hearing until after trial.") (citing
United States v. Helmsley, 941 F.2d 71, 80 (2d Cir. 1991) and
United States v. Rivieccio, 919 F.2d 812, 814 (2d Cir. 1990)).
See also United States v. Harloff, 807 F. Supp. 2d 270, 282 n.3
(W.D.N.Y. 1992) (same) (citing cases).

        In any event, Sclafani gave the Kansas state trooper
consent to search his vehicle.  The Second Circuit, in reversing a
district court's suppression of evidence recovered from bags found
inside a vehicle, has held that "an individual who consents to a
search of his car should reasonably expect that readily opened,
closed containers discovered inside the car will be opened and
examined" as "[i]t is self-evident that a police officer seeking
general permission to search a vehicle is looking for evidence of
illegal activity" and "[i]t is just as obvious that such evidence
might be hidden in closed containers."  United States v. Snow, 44
F.3d 133, 135 (2d Cir. 1995).  Thus, "[i]f the consent to search
is entirely open-ended a reasonable person would have no cause to

31

believe that the search will be limited in some way." Id.
Accordingly, Sclafani's consent to search his car included his
consent to search the cell phones found in the car and his motion
to suppress should be denied. See e.g., United States v. Diaz,
210 F.3d 356, at *2-3 (2d Cir. 2000) (summary order) (citing Snow
and holding that consent to search vehicle included search of
closed briefcase); United States v. Galante, 1995 WL 507249, at *2
(S.D.N.Y. Aug. 25, 1995) (denying motion to suppress and finding
that owner's consent to search vehicle included consent to search
information stored in cell phone); United States v. Vaneenwyk, 260
F. Supp. 2d 423, 425 (W.D.N.Y. 2002) (denying motion to suppress
and finding that owner's general consent to search car included
consent to "look inside day planner book, which is analogous to a
closed container, that they found in the vehicle") (citing Snow).

> D.   There is No Basis to Suppress Any of the Consensual
>      Recordings Made By CS1

Sclafani moves to suppress "all consensual recordings"
made by CS1, arguing that because the government has not provided
discovery in relation to, among other things, "how the recordings
were conducted" and "what equipment was used," there must be "gaps
and breaks in the recordings made by [CS1]." Sclafani does not
point to even one "gap" or "break" in any of the recordings made
by CS1 that he contends was the result of tampering by CS1 and, as
he concedes, cannot point to any case law in the Second Circuit

that supports his position.[13]  His failure to do so is not
surprising for it is well established that allegations of
tampering with evidence go to the weight of the evidence rather
than to its admissibility.  See United States v. Sovie, 122 F.3d
122, 127 (2d Cir. 1997).  Indeed, the Second Circuit, in United
States v. Fuentes, 563 F.2d 527, 532 (2d Cir. 1977), expressly
rejected a defendant's "completely speculative" contention that
audio recordings made by a government informant were inadmissible
because the informant may have tampered with the recording
devices:

> Aside from being completely speculative, it is
> hard to believe that [the government
> informant] could have effectively changed the
> character of a running conversation, by
> turning the device on and off, without such
> attempts being immediately obvious to those
> present as well as to anyone listening to the
> tapes.

Id.  Accordingly, Sclafani's motion to suppress the consensual
recordings made by CS1 should be denied.

    E.   The Government Will Comply With Its Discovery
         Obligations

         1.   Rule 16 Discovery

         Sclafani demands that the government provide: (1) the

---

         [13]  United States v. Armstrong, 626 F. Supp. 2d 229 (D.P.R.
2009), the opinion from the district of Puerto Rico that Sclafani
contends is "directly on point," is inapposite.  In that case,
the defendant identified specific recordings that he claimed had
been altered, and the government's own expert testified that the
recording was not complete.  Id. at 233-234.

33

chain of custody of all drug seizures; (2) the chain of custody of the consensual recordings and all material involving the procedure used in the consensual recordings, the type of equipment used and any logs; (3) all laboratory reports; and (4) a listing of items that were seized during Joseph Sclafani's arrest.

The government has already provided the laboratory reports and numerous other items in discovery.  To the extent the information has not already been provided, the government will provide a list of items seized at the time of Sclafani's arrest.

Sclafani's remaining requests are not appropriate pursuant to Rule 16.  The chain of custody with respect to evidence seized and recordings made and the procedures used for the consensual recordings made by CW1 relate to admissibility of the evidence, which is an issue for trial.  <u>See</u> <u>United States v. Vondette</u>, 248 F. Supp. 2d 149, 159-60 (E.D.N.Y. 2001) (denying defendant's request for the production of the chain of custody in discovery).

### 2.   Sclafani's Request for Impeachment Material is Premature

Sclafani also demands that the government provide any information pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1973) as well as all impeachment material for CW1.  The government will comply with its <u>Brady</u> obligations.  With respect to the impeachment material Sclafani seeks, it appears that he is requesting early disclosure of material that is discoverable

34

pursuant to 18 U.S.C. § 3500.  As a general rule, defendants in criminal cases have no pretrial right to such information.  The defendants' attempt to obtain such impeachment material at this time is premature.  As Judge Johnson has noted:

> Evidence which is not exculpatory, but is relevant for the purposes of impeachment, must be produced to the defense, but need not be turned over in advance of trial. . . . The government may wait until a witness has testified before disclosure of such material is mandated.  Typical impeachment material, such as the witness's beneficial treatment by the government, is normally disclosed at the time the 3500 material is turned over - after the government's witness has testified on direct.  Therefore, Defendant's request that this Court direct the Government to immediately provide such material is denied.

United States v. Hotte, No. 97 CR 669 (SJ), 1997 WL 694718, at *2 (E.D.N.Y. Nov. 6, 1997) (internal citations omitted) (citing United States v. Nixon, 418 U.S. 683, 701 (1974); United States v. Payden, 613 F. Supp. 800, 821-22 (S.D.N.Y. 1963), and 18 U.S.C. § 3500(b)).

Although Giglio information may be provided after the government's witness has testified on direct, courts have also held that Giglio material must be provided with sufficient time for it to be useful to the defense.  However, this principle does not require the government to provide Giglio material months in advance of trial.  See, e.g., United States v. Underwood, 04 CR 424 (RWS), 2005 WL 927012, at * 3 (S.D.N.Y. April 21, 2005) (citing cases) (requiring the government to make its Brady and

35

<u>Giglio</u> disclosures on the Wednesday before trial was scheduled to begin in order to ensure that the defense had sufficient time to make use of the information).

Thus, in keeping with these principles and in an effort to avoid any adjournments or delay at trial which might occur if <u>Giglio</u> material is not produced until after the government's witnesses have testified at trial, the government will produce 3500 material for each witness approximately one week in advance of each witnesses' testimony, except with respect to those witnesses for whom the government has security concerns.  <u>See</u> <u>United States v. Earls</u>, 03 CR 364 (NRB) 2004 WL 350725, at *8 (S.D.N.Y. Feb. 25, 2004) (defendant's <u>Giglio</u> motion denied because the government has stated that it will produce <u>Giglio</u> material with its Jencks material no later than the "Friday of the week before a witness is expected to testify"); <u>United States v. Perez</u>, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) ("Following the usual practice in [the Southern] District, the government has agreed to make impeachment information available to the defense at the same time as Jencks Act material, <u>i.e.</u>, 'one day prior to the day the witness is called to testify on direct examination,' or, if additional time is reasonably required to review such material, sufficiently in advance of the witness' testimony so as to avoid any delay at trial.  This practice will allow defense counsel adequate time to prepare for cross-examination of government

witnesses as they testify at trial.") (internal citations omitted).[14]

In addition, except with respect to those witnesses for whom the government has security concerns,[15] approximately three weeks prior to trial, the government will produce a letter outlining the categories of criminal activities in which the government's cooperating witnesses have engaged, as well as an account of any funds paid to the witnesses or expended on them or their families.

---

[14]    Prior to the disclosure of any materials pursuant to 18 U.S.C. § 3500, the government will request an Order from the Court: (1) precluding the distribution of any disclosed 3500 material to any individual outside of the trial defendants, trial counsel and their paralegals or other legal staff, and (2) requiring that all 3500 material be returned to the government within forty-eight hours after the completion of trial in this matter.

[15]    The risk of witness intimidation is real in this case. Lombardo is a violent felon who, in 2000, was sentenced in the United States District Court, Southern District of New York, to ten years' incarceration for witness tampering by attempting to murder an individual whose brother Lombardo believed to be cooperating with the DEA.  (United States v. Neil Lombardo, 98 CR 1180 (DLC)).  Lombardo shot the victim in the neck and chest and ran over him with his car, but, miraculously, the victim survived.  More recently, when Sclafani became concerned that another individual might cooperate with the government, Sclafani informed CW1 that he might have to arrange for that potential witness to be killed.  Sclafani advised CW1 that Lombardo would kill the individual at A. Kupa's residence.

III. <u>Conclusion</u>

      For the reasons stated above, the government respectfully submits that the defendants' motions are without merit and should be denied.

                    Respectfully submitted,

                    LORETTA E. LYNCH
                    United States Attorney
                    Eastern District of New York

                    Rachel Nash
                    Robert Polemeni
                    Assistant U.S. Attorney
                    (Of Counsel)